ALP Sys., Inc. v. Haygood, 2021 NCBC 32.

STATE OF NORTH CAROLINA

BUNCOMBE COUNTY

ALP SYSTEMS, INC.; and STACY
BEAN,

          Plaintiffs,

v.

DALE RICHARD HAYGOOD;
BRANDEN D. BRYSON; KYLE
JAMES LEONARD; and BOLTED
LIGHTNING PROTECTION, LLC,

          Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 1380

**ORDER AND OPINION ON
DEFENDANT BOLTED LIGHTNING
PROTECTION, LLC'S
RENEWED MOTION TO DISMISS
PURSUANT TO RULE 12(b)(6)**

1.    **THIS MATTER** is before the Court on defendant Bolted Lightning Protection, LLC's ("Bolted") Renewed Motion to Dismiss (the "Motion to Dismiss"). (Mot. to Dismiss, ECF No. 24.)  Bolted moves for dismissal of plaintiff ALP Systems, Inc.'s ("ALP") claims against Bolted pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (the "Rule(s)").[1]  (Mot. to Dismiss 1.)

2.    For the reasons set forth in this Order and Opinion, the Court **GRANTS** in part and **DENIES** in part the Motion to Dismiss.

    *Hyler & Lopez, P.A., by George B. Hyler, Jr. and Stephen P. Agan, for plaintiff ALP Systems, Inc.*

    *Roberts & Stevens, P.A., by John D. Noor, for defendant Bolted Lightning Protection, LLC.*

Robinson, Judge.

---

[1] Bolted also moved for dismissal of ALP's claims pursuant to Rule 12(b)(2). (Mot. to Dismiss 1–2.)  The Court addressed Bolted's Rule 12(b)(2) challenge in a prior decision, concluding that the Court had personal jurisdiction over Bolted.  *See ALP Sys., Inc. v. Haygood*, 2021 NCBC LEXIS 12 (N.C. Super. Ct. Feb. 9, 2021).

# I.    INTRODUCTION

3.     In this action, ALP alleges that Bolted wrongfully induced defendants Dale Richard Haygood ("Haygood"), Branden D. Bryson ("Bryson"), and Kyle James Leonard ("Leonard") to violate non-disclosure provisions and non-compete covenants that they signed during their employment with ALP.  In addition, ALP asserts that Bolted wrongfully induced customers of ALP to stop doing business with ALP.  Lastly, ALP contends that Bolted has misappropriated trade secrets belonging to ALP.

# II.    FACTUAL BACKGROUND

4.     The Court does not make findings of fact on a Rule 12(b)(6) motion to dismiss.  Instead, the Court will recite the factual allegations, taken from ALP's Amended Complaint, (Am. Compl., ECF No. 12), and its attachments, that are relevant to the Court's ruling on the Motion to Dismiss.

## A.    The Parties

5.     ALP is a North Carolina-based corporation that designs and installs lightning protection systems for residential and commercial buildings and conducts technical presentations and educational seminars for its customers.  (Am. Compl. ¶¶ 1, 10–11.)  ALP and its predecessors have been in business for over 30 years.  (Am. Compl. ¶ 10.)

6.     Bolted is a Florida-based limited liability company that provides lightning protection services.  (Am. Compl. ¶¶ 7, 38, 50.)  Bolted was formed in June 2019.  (Am. Compl. ¶¶ 27, 37.)

7. Haygood is a resident of North Carolina. (Am. Compl. ¶ 3.) From April 2012 to July 2019, Haygood was employed by ALP as a sales professional at its office in Waynesville, North Carolina. (Am. Compl. ¶¶ 14–15, 23.) Haygood's job entailed creating customer relationships and estimating projects for ALP. (Am. Compl. ¶¶ 14–15.)

8. Leonard is a resident of North Carolina. (Am. Compl. ¶ 6.) From March 2015 to July 2018, Leonard was employed by ALP as a project manager at its Waynesville office. (Am. Compl. ¶¶ 82, 90.)

9. Bryson is a resident of North Carolina. (Am. Compl. ¶ 5.) From July 2016 to January 2020, Bryson was employed by ALP as a lightning protection system designer at its Waynesville office. (Am. Compl. ¶¶ 51, 71.)

## B. Haygood, Leonard, and Bryson Sign Employment Agreements

10. As a condition of their employment with ALP, Haygood, Leonard, and Bryson signed agreements containing non-disclosure provisions and non-compete covenants (the "Employment Agreement(s)"). (*See* Am. Compl. ¶¶ 16–21, 53–59, 84–90; *see also* Am. Compl. Exs. 1 ["Haygood Agreement"], 8 ["Bryson Agreement"], 14 ["Leonard Agreement"].)

11. Haygood's Employment Agreement, which he signed in April 2012, (Am. Compl. ¶ 16), contains the following non-disclosure provisions:[2]

> It is understood and agreed to that the below identified employee of intellectual property may provide information that must be kept confidential and solely within ALP Systems.

---

[2] The Employment Agreements contain a number of typographical and grammatical errors. The Court makes note of this, since the Court has elected not to use "sic" each time that it quotes from the Employment Agreements.

1. The confidential information to be disclosed can be described as and includes:

Business information relating to proprietary ideas, trade secrets, drawings, illustrations, products, services, costs, proposals, profit, finances, financial projections, customers, clients, marketing, current or future business plans, regardless of whether such information is designated as "Intellectual Property or Confidential Information" at the time of this disclosure.

2. The employee agrees not to disclose any "Intellectual Property or Confidential Information" obtained from ALP Systems to anyone unless required to do so by law.

(Haygood Agreement.)

12. Haygood's Employment Agreement also contains a non-compete covenant,

which states as follows:

4. The employee recognizes that the various items of Information are special and unique assets of ALP Systems and need to be protected from improper disclosure. In consideration of the disclosure of the Information, the employee agrees and covenants that for a period of 2 years following the termination of employment, whether such termination is voluntary or involuntary, the employee will not directly or indirectly engage in any business competitive with ALP. This covenant shall apply to the geographical area that includes the area within a 200-mile radius of ALP Systems. Directly or indirectly engaging in any competitive business includes, but is not limited to: (I) engaging in a business as owner, partner, or agent, (II) becoming an employee of any third party that is engaged in such business, (III) becoming interested directly or indirectly in any such business, or (IV) soliciting any customer of ALP for the benefit of a third party that is engaged in such business.

(Haygood Agreement.)

13.     Leonard and Bryson's Employment Agreements, which they signed in April 2015 and July 2016, respectively,[3] contain identical non-disclosure provisions and non-compete covenants that are different from those contained in Haygood's Employment Agreement, (*compare* Leonard Agreement ¶¶ 6–9, *and* Bryson Agreement ¶¶ 6–9, *with* Haygood Agreement).[4]

14.     Leonard and Bryson's non-disclosure provisions state as follows:

> **6. CONFIDENTIALITY.** [Employee] recognizes that ALP has and will have information regarding the following:
> - inventions
> - trade secrets
> - customer lists
> - business affairs
> - future plans
>
> and other vital information items (collectively, "Information") which are valuable, special and unique assets of ALP. [Employee] agrees that [Employee] will not at any time or in any manner, either directly or indirectly, divulge, disclose, or communicate any Information to any third party without the prior written consent of ALP. [Employee] will protect the Information and treat it as strictly confidential. A violation by [Employee] of this paragraph shall be a material violation of this Contract and will justify legal and/or equitable relief.
>
> **7. UNAUTHORIZED DISCLOSURE OF INFORMATION.** If it appears that [Employee] has disclosed (or has threatened to disclose) Information in violation of this Contract, ALP shall be entitled to an injunction to restrain [Employee] from disclosing, in whole or in part,

---

[3] The Amended Complaint alleges that Leonard and Bryson both signed their Employment Agreements on 5 July 2016. (Am. Compl. ¶¶ 53, 84.) However, the Employment Agreements attached to the Amended Complaint reflect that Leonard signed his agreement on 30 April 2015 and that Bryson signed his agreement on 5 July 2016. (Leonard Agreement 4 & Bryson Agreement 4.) The conflict between the allegations in the Amended Complaint and the dates on these agreements is not material to the Court's ruling on the Motion to Dismiss.

[4] Leonard and Bryson's non-disclosure provisions and non-compete covenants only differ from one another as to the names of the employees, and Haygood's non-compete covenant is only slightly different than Leonard and Bryson's non-compete covenants, as can be seen by comparing the three covenants. The three covenants, however, all contain identical language that is relevant to the Court's analysis, as addressed below.

such Information, or from providing any services to any party to whom such Information has been disclosed or may be disclosed. ALP shall not be prohibited by this provision from pursuing other remedies, including a claim for losses and damages.

**8. CONFIDENTIALITY AFTER TERMINATION OF EMPLOYMENT.** The confidentiality provisions of this Contract shall remain in full force and effect for a 2 year period period after the termination of [Employee's] employment. During such 2 year period period, neither party shall make or permit the making of any public announcement or statement of any kind that [Employee] was formerly employed by or connected with ALP.

(Leonard Agreement & Bryson Agreement ¶¶ 6–8.)

15. Leonard and Bryson's non-compete covenants provide that:

**9. NON-COMPETE AGREEMENT.** [Employee] recognizes that the various items of Information are special and unique assets of the company and need to be protected from improper disclosure. In consideration of the disclosure of the Information to [Employee], [Employee] agrees and covenants that for a period of 2 years following the termination of this Contract, whether such termination is voluntary or involuntary, [Employee] will not directly or indirectly engage in any business competitive with ALP. This covenant shall apply to the geographical area that includes the area within a 200-mile radius of Waynesville NC. Directly or indirectly engaging in any competitive business includes, but is not limited to: (i) engaging in a business as owner, partner, or agent, (ii) becoming an employee of any third party that is engaged in such business, (iii) becoming interested directly or indirectly in any such business, or (iv) soliciting any customer of ALP for the benefit of a third party that is engaged in such business. [Employee] agrees that this non-compete provision will not adversely affect [Employee's] livelihood.

(Leonard Agreement & Bryson Agreement ¶ 9.)

C. **ALP's Claims and Allegations Against Bolted**

16. ALP has asserted claims against Bolted for tortious interference with existing and prospective contracts, misappropriation of trade secrets pursuant to N.C.G.S. § 66-153, and unfair methods of competition pursuant to N.C.G.S. § 75.1.1.

(Am. Compl. ¶¶ 164–88.) In short, these claims arise from ALP's allegations that Bolted hired Haygood, Leonard, and Bryson, who were each bound by the non-disclosure provisions and non-compete covenants set forth above, and acquired from them trade secrets belonging to ALP, including confidential customer information.

17. ALP alleges that Bolted hired Haygood in early 2019, while he was still employed by ALP. (Am. Compl. ¶¶ 22–24, 26–27, 39.) Haygood then allegedly used ALP's confidential customer information to solicit ALP's customers and provide those customers with lightning protection services on Bolted's behalf. (Am. Compl. ¶¶ 22–24, 37, 39–43, 46.) The ALP customers that ALP contends Haygood brought to Bolted include North American Roofing, the United States government, Florida State University, and Bass Pro Shops, (Am. Compl. ¶¶ 40–43, 46), though ALP believes there are others, (Am. Compl. ¶ 48).

18. Haygood also allegedly recruited Leonard, a former employee of ALP, in July 2019 to come work for Bolted. (Am. Compl. ¶¶ 44–45, 91.) ALP alleges that Leonard performed work on Bolted's behalf for North American Roofing, the United States government, and Florida State University. (Am. Compl. ¶¶ 44–45, 47, 65–66.)

19. Around this same time, Bolted allegedly hired Bryson, who was still employed by ALP. (Am. Compl. ¶¶ 61–63.) According to ALP, Bryson used computer-aided design software owned by ALP to prepare a technical drawing on Bolted's behalf in connection with a project that Bolted was completing for the United States government in South Korea. (Am. Compl. ¶¶ 61–63.)

20. For that same project, Haygood, Leonard, and/or Bryson allegedly used several forms that were developed by ALP. (Am. Compl. ¶ 66.) ALP asserts that Haygood and/or Bryson provided these forms to Bolted. (Am. Compl. ¶ 69.) ALP also contends that one of these forms was misleading, as submitted by Bolted for the project, because it displayed the Lightning Protection Institute's logo and identified Leonard as a certified "Master Installer," even though neither Leonard nor Bolted were certified by the Lightning Protection Institute at the time. (Am. Compl. ¶¶ 50, 66–68.)

21. In addition, ALP alleges that Haygood and Bryson provided to Bolted the following trade secrets belonging to ALP: ALP's "customer database, its records of the materials, labor, and equipment required for each project, its inspection report form, its operations/maintenance manual, and its Corporate Safety Program & Employee Safety Manual." (Am. Compl. ¶¶ 78–79; *see also* Am. Compl. ¶¶ 72–77.) Attached to the Amended Complaint is the first page of a safety manual bearing Bolted's name, (Am. Compl. Ex. 12), which ALP asserts was taken by Haygood or Bryson without ALP's consent and provided to Bolted, (Am. Compl. ¶ 73).

22. ALP also alleges that in January 2020, Leonard broke into ALP's Waynesville office and stole "a roll of very unique copper conductor," two "ESAB invertor welders," "a Sony 4k camcorder containing training videos," and "confidential information" from ALP's filing room, which he then provided to Bolted. (Am. Compl. ¶ 92–93.)

23.     According to ALP, Bolted "clearly knew, or reasonably should have known, that it had acquired and/or used [ALP's] valuable trade secrets without the express or implied consent of [ALP]." (Am. Compl. ¶ 81.)  Further, ALP alleges that Bolted was "aware, and at all relevant times [has] been aware, of the non-disclosure and non-compete contract[s]" signed by Haygood, Leonard, and Bryson during their employment with ALP.  (Am. Compl. ¶¶ 166, 168, 170.)  Finally, ALP alleges that Bolted was "aware of [ALP's] existing contracts and prospective contracts to provide lightning-protection services to its customers, including: a) North America[n] Roofing, b) the US Government Camp Humphreys USAG South Korea, c) Florida State University, d) Bass Pro Shops, and e) other businesses."  (Am. Compl. ¶ 173.)

## III.     PROCEDURAL BACKGROUND

24.     ALP and plaintiff Stacy Bean ("Bean")[5] (together, "Plaintiffs") initiated this action upon filing their original Complaint on 13 April 2020.  (ECF No. 4.)  On 22 April 2020, Plaintiffs filed their Amended Complaint.  (Am. Compl.)

25.     This action was designated to the North Carolina Business Court by Order of the Chief Justice of the North Carolina Supreme Court on 1 May 2020, (ECF No. 1), and assigned to the undersigned by Order of the Chief Business Court Judge on 4 May 2020, (ECF No. 2).

26.     In addition to filing suit against Bolted, ALP has asserted several claims against Haygood, Leonard and Bryson. (Am. Compl. ¶¶ 96–161.)  Meanwhile, Bean has brought a single claim against Leonard, requesting the entry of a no-contact order

---

[5] Bean is the spouse of Eric Bean, the president of ALP.  (Am. Compl. ¶ 2.)

based on Bean's assertion that Leonard "stalk[ed] or harasse[d] her." (Am. Compl. ¶¶ 94–95, 162–63.) Iain P. King ("King"), the manager and president of Bolted, (Am. Compl. ¶¶ 30, 41), was also a named defendant in this action until ALP filed a Notice of Voluntary Dismissal on 26 August 2020, voluntarily dismissing without prejudice all its claims against him. (ECF No. 50.)

27. On 29 May 2020, Bolted and King (before he was voluntarily dismissed from the action) filed the Motion to Dismiss, asserting that ALP's claims against Bolted should be dismissed for lack of personal jurisdiction pursuant to Rule 12(b)(2) or, alternatively, for failure to state a claim pursuant to Rule 12(b)(6). (Mot. to Dismiss.)

28. After full briefing on the Motion to Dismiss, the Court held a hearing on the Motion on 29 October 2020, (ECF No. 74), at which all parties were represented by counsel, with the exception of Haygood, who is currently proceeding *pro se* in this action. The Motion to Dismiss is now ripe for resolution.

29. On 9 February 2021, the Court denied the Motion to Dismiss to the extent that it requested dismissal of ALP's claims pursuant to Rule 12(b)(2). *See ALP*, 2021 NCBC LEXIS 12.

30. The Court now resolves Bolted's Rule 12(b)(6) challenge.

## IV. LEGAL STANDARD

31. When ruling on a Rule 12(b)(6) motion to dismiss, the Court views the complaint's allegations in the light most favorable to the plaintiff. *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017). The Court analyzes "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim

upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670 (1987). As part of this analysis, the Court treats all well-pleaded factual allegations as true. *See Krawiec v. Manly*, 370 N.C. 602, 606 (2018). The Court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274 (2005) (citation omitted). Additionally, the Court may consider documents attached to and incorporated into the complaint without converting the Rule 12(b)(6) motion to dismiss into a motion for summary judgment. *See Moch v. A.M. Pappas & Assocs., LLC.*, 251 N.C. App. 198, 206 (2016).

32. Granting a Rule 12(b)(6) motion to dismiss is proper when "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (citation omitted). The Supreme Court of North Carolina "routinely uses [this] Rule 12(b)(6) standard . . . in assessing the sufficiency of complaints in the context of complex commercial litigation." *Id.* at 615 n.7.

## V. ANALYSIS

33. Bolted moves to dismiss ALP's claims against Bolted for tortious interference with existing and prospective contracts, misappropriation of trade

secrets pursuant to N.C.G.S. § 66-153, and unfair methods of competition pursuant to N.C.G.S. § 75.1.1. The Court addresses each claim in turn.

## A. Tortious Interference With Existing and Prospective Contracts

34. ALP alleges that Bolted intentionally induced Haygood, Leonard, and Bryson to breach their Employment Agreements with ALP by hiring and paying these individuals to work for Bolted. (Am. Compl. ¶ 171.) ALP also alleges that Bolted intentionally induced North American Roofing, the United States government, Florida State University, Bass Pro Shops, and other ALP customers to not perform under their existing contracts or not enter into new contracts with ALP. (Am. Compl. ¶ 174.) According to ALP, Bolted's interference with these business relations was unjustified. (Am. Compl. ¶¶ 172, 174.) Thus, as pled in the Amended Complaint, ALP has raised a claim against Bolted for both tortious interference with contract and with prospective economic advantage.

35. "The difference between [tortious interference with contract and with prospective economic advantage] is slight." *Lunsford v. ViaOne Servs., LLC*, 2020 NCBC LEXIS 111, at *13 (N.C. Super. Ct. Sept. 28, 2020). To state a claim for tortious interference with contract, the plaintiff must allege that a valid contract existed between the plaintiff and a third party and that the defendant induced the third party without justification to not perform the contract. *See United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661 (1988). To state a claim for tortious interference with prospective economic advantage, the plaintiff must allege that the defendant "acted without justification in inducing a third party to refrain from entering into a

contract with [the plaintiff] which contract would have ensued but for the interference." *Walker v. Sloan*, 137 N.C. App. 387, 393 (2000) (cleaned up).

36. Bolted contends that ALP's tortious interference claims should be dismissed for two reasons: (1) the non-compete covenants contained in Haygood, Leonard, and Bryson's Employment Agreements are overly broad and therefore unenforceable as a matter of law, and (2) the Amended Complaint's allegations establish that Bolted's alleged interference was justified. (*See* Br. in Supp. ¶¶ 25–34, ECF No. 26.)

37. The Court begins with Bolted's challenge to the enforceability of the non-compete covenants. Non-compete covenants are "not viewed favorably in modern law." *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508 (2004) (citation omitted). As this Court has explained,

> [t]o be valid, the restrictions on the employee's future employability by others must be no wider in scope than is necessary to protect the business of the employer. If a non-compete covenant is too broad to be a reasonable protection to the employer's business it will not be enforced. The courts will not rewrite a contract if it is too broad but will simply not enforce it.

*PDF Elec. & Supply Co., LLC v. Jacobsen*, 2020 NCBC LEXIS 103, at *17–18 (N.C. Super. Ct. Sept. 9, 2020) (quoting *VisionAIR,* 167 N.C. App. at 508). "The reasonableness of a non-competition covenant is a matter of law for the court to decide." *Medical Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 655 (2009).

38. Based on these principles, the North Carolina Court of Appeals has declined to enforce non-compete covenants prohibiting employees from directly or indirectly

having any association with competing businesses. *See, e.g., VisionAIR*, 167 N.C. App. at 508–09; *Hartman v. W.H. Odell & Assocs.*, 117 N.C. App. 307, 308, 317 (1994).

39. In *VisionAIR*, for instance, the Court of Appeals determined that a non-compete covenant providing that the former employee could "not 'own, manage, be employed by or otherwise participate in, directly or indirectly, any business similar to Employer's . . . within the Southeast" for two years after the termination of his employment was overbroad and thus not unenforceable. 167 N.C. App. at 508. In reaching this conclusion, the Court of Appeals noted that

> [u]nder this covenant [the former employee] would not merely be prevented from engaging in work similar to that which he did for [his former employer] at [the former employer's] competitors; [the former employee] would be prevented from doing even wholly unrelated work at any firm similar to [the former employer]. Further, by preventing [the former employee] from even "indirectly" owning any similar firm, [the former employee] may, for example, even be prohibited from holding interest in a mutual fund invested in part in a firm engaged in business similar to [the former employer]. Such vast restrictions on [the former employee] cannot be enforced.

*Id.* at 508–09 (footnote omitted).

40. Here, the non-compete covenants provide that Haygood, Leonard, and Bryson "will not directly or indirectly engage in any business competitive with ALP" and that

> [d]irectly or indirectly engaging in any competitive business includes, but is not limited to: [1] engaging in a business as owner, partner, or agent, [2] becoming an employee of any third party that is engaged in such business, [3] becoming interested directly or indirectly in any such business, or [4] soliciting any customer of ALP for the benefit of a third party that is engaged in such business.

(Haygood Agreement; Leonard Agreement ¶ 9; Bryson Agreement ¶ 9.) This language is seemingly limitless in its scope, especially because of the phrase "includes, but is not limited to" and because "competitive business" is not defined anywhere in the covenants.

41.     As Bolted points out, (Br. in Supp. ¶ 31), these non-compete covenants, as drafted, could prohibit Haygood, Leonard, and Bryson from performing future work entirely unrelated to the duties they performed for ALP—for example, working as custodians for a competitive business. *See Hartman*, 117 N.C. App. at 317 (declining to enforce a non-compete covenant, where it "appear[ed] to prevent plaintiff from working as a custodian" for a competing business). The language used by the covenants is also broad enough to prohibit them from indirectly holding an ownership interest in a competitive business through a mutual fund—the type of restriction disavowed in *VisionAIR*. As a result of these vague, overbroad restrictions, the Court concludes that the non-compete covenants are unreasonable and unenforceable as a matter of well-established North Carolina law.

42.     That said, the Court notes that Bolted has not challenged the enforceability of the non-disclosure provisions contained in the Employment Agreements. *See Chemimetals Processing v. McEneny*, 124 N.C. App. 194, 197 (1996) (explaining that under certain circumstances, a non-disclosure provision may be subject to a more lenient standard than the strict standard used to review non-compete covenants). And because ALP's tortious interference with contract claim against Bolted is based

on *both* the non-compete covenants *and* the non-disclosure provisions,[6] (Am. Compl. ¶¶ 165–72), the Court cannot conclude that this claim should be dismissed in its entirety at this time. Whether the non-disclosure provisions are enforceable or whether the non-compete covenants' unenforceability renders the Employment Agreements unenforceable in their entirety is not currently before the Court for consideration. As such, the Court rules only that ALP cannot base its tortious interference with contract claim on Bolted's alleged interference with the non-compete covenants.

43. The Court now turns to Bolted's additional argument that even if it interfered with ALP's contractual relationships, its alleged interference was justified. A Rule 12(b)(6) motion to dismiss a tortious interference claim "should be granted when the complaint reveals that the interference was justified or privileged." *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 220 (1988). "If the defendant's only motive is a malicious wish to injure the plaintiff, his actions are not justified." *Id.* at 221; *see also Pinewood Homes, Inc. v. Harris*, 184 N.C. App. 597, 605 (2007) ("[W]e have held that the complaint must admit of no motive for interference other than malice."). "If, however, the defendant is acting for a legitimate business purpose, his actions are privileged." *Hooks*, 322 N.C. at 221. "[C]ompetition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interest and by means that are lawful." *Id.*; *see also Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498 (1992) ("Generally

---

[6] ALP's tortious interference with contract claim is also premised on Bolted's alleged interference with ALP's existing contracts with certain customers. (Am. Compl. ¶¶ 173–74.)

speaking, interference with contract is justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an outsider, are competitors.").

44. In this case, the Amended Complaint contains allegations that could be construed as establishing that Bolted hired Haygood, Leonard, and Bryson and solicited business from ALP's customers as ALP's competitor. (*See, e.g.*, Am. Compl. ¶¶ 10, 38–39.) Relying on these allegations and the general rule that interference by a competitor is justified, Bolted avers that its alleged conduct was justified as a matter of North Carolina law. (*See* Br. in Supp. ¶ 33.)

45. Bolted, however, overlooks other relevant allegations that undercut its argument. As an example, ALP alleges in the Amended Complaint that Bolted tortiously interfered with ALP's existing and prospective customer contracts "by, among other things, misleading [ALP's] customers, without justification, about [Bolted's] affiliation with [ALP] and about the qualifications of [Bolted] to provide lightning-protection services." (Am. Compl. ¶ 174; *see also* Am. Compl. ¶¶ 50, 68.) Moreover, ALP claims that Bolted misappropriated ALP's trade secrets,[7] which Bolted allegedly acquired through its hiring of Haygood, Leonard, and Bryson. (*See* Am. Compl. ¶¶ 79, 177–82.) Also, ALP alleges that Bolted's tortious interference was "malicious, willful, and/or wanton[.]" (Am. Compl. ¶ 176.)

46. All these allegations, if proven, could ultimately support a finding that Bolted's interference was exercised for a wrongful purpose or carried out by unlawful

---

[7] As explained more fully below, ALP has adequately stated a claim against Bolted for misappropriation of trade secrets.

means, even if Bolted is found to be ALP's competitor. *See Hooks*, 322 N.C. at 220–21 (making clear that "the privilege to interfere is conditional or qualified" and may be "lost if exercised for a wrong purpose" and that "competition in business constitutes justifiable interference" if carried out by "means that are lawful") (citations and alterations omitted); *see also E-Ntech Indep. Testing Servs. v. Air Masters, Inc.*, 2017 NCBC LEXIS 2, at \*17 (N.C. Super. Ct. Jan. 5, 2017) ("The same allegations of wrongful conduct that permit Plaintiff's claim for misappropriation of trade secrets to survive Defendants' [motion to dismiss] are likewise sufficient to show that Defendants' competition was not through lawful means."); *S. Fastening Sys. v. Grabber Constr. Prods., Inc.*, 2015 NCBC LEXIS 42, at \*23–24 (N.C. Super. Ct. Apr. 28, 2015) (declining to dismiss a tortious interference claim because, among other things, the complaint alleged that a defendant "improperly acquired, disclosed and used [the plaintiff's] confidential and trade secret information"). Accordingly, the Court concludes that ALP has adequately pled that Bolted acted without justification when it tortiously interfered with ALP's existing and prospective contracts.[8]

47.    To summarize, the Court denies Bolted's Motion to Dismiss ALP's claims against Bolted for tortious interference with contract and with prospective economic advantage except to the extent that ALP's tortious interference with contract claim is based on Bolted's alleged interference with the non-compete covenants signed by

---

[8]  In light of this ruling, the Court also rejects Bolted's contention that ALP's tortious interference claims should be dismissed because ALP "only generally alleges malice." (Br. in Supp. ¶ 32.)

Haygood, Leonard, and Bryson; to that extent, the Court concludes that ALP's tortious interference with contract claim should be dismissed with prejudice.

## B. Misappropriation of Trade Secrets

48. The North Carolina Trade Secrets Protection Act defines a trade secret as

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3). "To plead misappropriation of trade secrets, a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec*, 370 N.C. at 609 (citation omitted).

49. As noted, ALP alleges that Bolted misappropriated the following alleged trade secrets: ALP's "customer database, its records of the materials, labor, and equipment required for each project, its inspection report form, its operations/maintenance manual, and its Corporate Safety Program & Employee Safety Manual." (Am. Compl. ¶¶ 178–82.) Bolted counters that ALP has not identified with sufficient particularity any trade secrets allegedly misappropriated

by Bolted except for the Corporate Safety Program & Employee Safety Manual. (*See* Br. in Supp. ¶ 39.) The Court disagrees.

50. ALP's customer database—which ALP alleges "is and at all relevant times has been stored and maintained through a cloud-based account with www.act.com, operated by Swiftpage ACT! LLC," (Am. Compl. ¶ 13)—identifies a trade secret with sufficient particularity at this stage of the litigation. *See, e.g.*, *Krawiec*, 370 N.C. at 610 ("[W]e agree . . . that '[i]nformation regarding customer lists . . . can qualify as a trade secret under G.S. § 66-152(3).'" (citation omitted)); *Window Gang Ventures, Corp. v. Salinas*, 2019 NCBC LEXIS 24, at *39–41 (N.C. Super. Ct. Apr. 2, 2019) (concluding that an alleged trade secret described in the complaint as "compiled customer information, including the identity of potential customers and specifications provided by customers" was "sufficient to withstand scrutiny under Rule 12(b)(6)").

51. The same holds true for ALP's records of the materials, labor, and equipment required for each project, its inspection report form, and its operations/maintenance manual. *See, e.g.*, *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 375–76 (2001) (holding that "plaintiff presented sufficient evidence to support a finding that its historical cost information was a trade secret as defined by G.S. § 66-152[,]" where "plaintiff offered evidence . . . that it had maintained detailed cost records as to the materials, labor and equipment required for each of its contracts"); *id.* at 375 ("Confidential data regarding operating and pricing policies can also qualify as trade secrets." (citation omitted)); *GE Betz, Inc. v. Conrad*, 231 N.C. App. 214, 234 (2013) (concluding that "pricing information,

customer proposals, historical costs, and sales data" had been "alleged with sufficient particularity for [the] defendants to delineate that which they were accused of misappropriating and for the trial court to determine whether a misappropriation occurred"); *Window Gang Ventures*, 2019 NCBC LEXIS 24, at *42–43 (determining that the plaintiff's allegations concerning its "step-by-step service manual, employee manual, and operations manual, guidelines, and recommendations for operating a successful franchise [were] likewise sufficient" to survive a Rule 12(b)(6) motion).

52.     In short, viewing the Amended Complaint's allegations in the light most favorable to ALP, the Court concludes that ALP has sufficiently stated a claim for misappropriation of trade secrets against Bolted.[9]  The Court thus denies Bolted's Motion to Dismiss this claim.

C.     **Unfair Methods of Competition**

53.     Finally, Bolted contends that "because ALP's claims for tortious interference and misappropriation of trade secrets should be dismissed, its claim for [unfair methods of competition] which is premised on those two claims is fatally flawed for the same reasons and should also be dismissed." (Br. in Supp. ¶ 43.) Thus, having denied the Motion to Dismiss ALP's claims against Bolted for tortious

---

[9] Bolted also argues that ALP's misappropriation of trade secrets claim should be dismissed because ALP has not pled facts to satisfy six factors recited by our Court of Appeals in *Sterling Title Company v. Martin*, 266 N.C. App. 593, 601 (2019).  (*See* Br. in Supp. ¶¶ 37, 40.)  "The factors overlap, and courts considering these factors do not always examine them separately and individually."  *Computer Design & Integration, LLC v. Brown*, 2017 NCBC LEXIS 8, at *23 (N.C. Super. Ct. Jan. 27, 2017); *see also Sterling*, 266 N.C. App. at 601–02 (reciting, but not applying, each factor).  In any event, these factors do not lead to dismissal of ALP's misappropriation of trade secrets claim, given that the Court has determined that ALP has met the pleading standard set forth by our Supreme Court in *Krawiec* for this type of claim.

interference with existing and prospective contracts and misappropriation of trade secrets, the Court also denies the Motion to Dismiss ALP's unfair methods of competition claim against Bolted except to the extent that claim is based on Bolted's alleged interference with the non-compete covenants.

## VI.   CONCLUSION

54.     For the foregoing reasons, the Court hereby **DENIES** Bolted's Motion to Dismiss except to the extent that ALP's tortious interference with contract claim is based on Bolted's alleged interference with the non-compete covenants signed by Haygood, Leonard, and Bryson; to that extent only, the Motion to Dismiss is **GRANTED**, and ALP's tortious interference with contract claim based on the non-compete covenants is hereby **DISMISSED** with **PREJUDICE**.

**SO ORDERED**, this the 10th day of May, 2021.


/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases